[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13227
Non-Argument Calendar
_____

D.C. Docket No. 2:13-cv-00152-AKK-TMP

THOMAS G. BRENNAN,

Plaintiff-Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,
CARTER F. DAVENPORT,
JOSEPH H. HEADLEY,
GWENDOLYN TERRANCE,
CORIZON MEDICAL SERVICES, INC., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 17, 2015)

Before TJOFLAT, WILSON and MARTIN, Circuit Judges.

PER CURIAM:

Thomas Brennan, a state prisoner proceeding pro se, appeals the district court's dismissal of his civil rights complaint for failure to state a claim. Brennan's complaint alleged he suffered Eighth Amendment and state tort law violations after he fell and was injured at the St. Clair Correctional Facility. Brennan repeatedly asked for treatment from various officials at the prison, but claims he did not receive the help he needed. He argues he sufficiently alleged an unconstitutional delay in treatment and denial of adequate pain medication and physical therapy. He also argues he sufficiently alleged that deputy wardens failed to intervene when he submitted internal grievances. Finally, he argues that the district court erred by failing to give him an opportunity to amend his complaint.[1] Upon review of the record and consideration of the parties' briefs, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

---

[1] Brennan's complaint also named Kim Thomas, the Commissioner of the Alabama Depart of Corrections, and Carter Davenport, the warden of the St. Clair Correctional Facility, as defendants. Brennan has not raised any argument about either Thomas or Davenport on appeal, so he has abandoned any argument related to these two defendants. Timson v. Sampson, 518 F.3d 870, 874 (11th Cir. 2008) (per curiam). He also alleged that deputy wardens Joseph Headley and Gwendolyn Terrance created a risk of harm by failing to provide slip prevention and not adequately supervising their staff, and that Colleen Oakes was deliberately indifferent by delaying delivery of his orthopedic shoes. Because he does not raise any of these arguments on appeal, they too are abandoned. Id.

2

I.

We review de novo the district court's dismissal of an action for failure to state a claim, viewing the allegations in the complaint as true. Dimanche v. Brown, 783 F.3d 1204, 1214 (11th Cir. 2015). When a prisoner files a civil action against a governmental entity, officer, or employee, the district court must review the complaint as soon as is practicable. 28 U.S.C. § 1915A(a). The court must dismiss the complaint, or any portion of the complaint, that fails to state a claim upon which relief may be granted. Id. § 1915A(b)(1); see also Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (asking whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (quotation omitted)).

Brennan's claims all challenge his medical care under the Eighth Amendment. Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment. McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999); Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976). To establish a claim of deliberate indifference under 42 U.S.C. § 1983, a plaintiff must satisfy an objective component by showing that he had a serious medical need. Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007). He must also satisfy a subjective component by showing that the prison official acted with deliberate indifference to his serious medical need. Id. Under the subjective

3

component, the prisoner must establish: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).

The district court found that Brennan was suffering from a serious medical condition after he slipped and fell on a waxed concrete floor. Thus, the only issue on appeal is whether he adequately alleged that each defendant was deliberately indifferent to that serious medical need. We address Brennan's allegations below, liberally construing his pro se pleadings. Dimanche, 783 F.3d at 1214.

**Delay in Diagnosis and Treatment**

*Anissa Thomas*

Anissa Thomas, a nurse practitioner, did not conduct a physical examination or allow Brennan to see a doctor during the 34-day period between his fall on November 4 and his first appointment with general practitioner Dr. William Talley on December 8. Immediately after the fall, Brennan complained to Thomas about neck, shoulder, elbow, lower back, hip, and knee pain. Thomas ordered x-rays of his lower back and prescribed Motrin for the pain. Brennan complained of increasingly severe pain, requested stronger pain medication and muscle relaxers, and asked to see a doctor. Though she did not examine Brennan, Thomas became upset and told him that he would not be allowed to see a doctor or receive additional medication. Brennan saw Thomas again on November 12 and

4

November 15.  He raised the same complaints, and also stated that he had developed a bulge in his neck.  Thomas told him that it was his spine and that it was normal.  When he again requested to see a doctor and asked for additional medication, Thomas ordered him to leave her office.  He saw Thomas for the fourth time on December 2, and she yet again denied his requests.  On December 8, at the request of health services administrator Colleen Oakes, Brennan finally saw Dr. Talley.  Dr. Talley performed a physical examination and became concerned about the pain and lack of movement in Brennan's neck, shoulders, arms, lower back, and legs.  He asked Brennan why his neck was never x-rayed, but Brennan did not know.  Dr. Talley ordered an urgent neck x-ray and prescribed a muscle relaxer.

Brennan told Thomas that he was in severe pain, felt a bulge in his neck, and had suffered a serious injury.  Despite his repeated requests for additional treatment, his obvious pain, and his limited mobility, Thomas told him he would not be allowed to see a doctor or specialist.  Only after filing two grievances was he finally seen by Dr. Talley, who immediately recognized the seriousness of his condition.  Brennan has alleged sufficient facts to draw an inference that Thomas knew of the risk of harm and disregarded that risk.  See Goebert, 510 F.3d at 1327 ("Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact subject to demonstration in the usual ways, including

5

inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (quotation omitted)).  Brennan also sufficiently alleged that, although his need for treatment was apparent, Thomas provided medical care so cursory as to amount to no treatment at all and delayed his diagnosis and treatment for no legitimate medical reason.  See McElligott, 182 F.3d at 1255.

*Dr. Talley and Colleen Oakes*

Brennan's complaint also alleged a second delay attributable to Dr. Talley and Colleen Oakes violated the Eighth Amendment.  He says the delay between January 18, when Dr. Talley referred him to a specialist, and May 14, when he saw a neurologist, showed deliberate indifference.  On January 18 Brennan learned that the CT scan showed herniated disks in his neck and lower back.  Dr. Talley stated that Brennan would need to see a neurologist and that he would need two surgeries to repair the damage.  Brennan saw Dr. Talley again on February 8, asked when he was going to see the neurologist, and complained that his pain was getting worse when the medications wore off.  Dr. Talley said that he should have already seen a neurologist and that the pain would continue to get worse until he underwent surgery.  Oakes knew this information no later than February 22, when she met with Dr. Talley and Brennan to discuss his pain management.

6

Brennan's allegation that Oakes and Dr. Talley were aware that he needed treatment, including surgery, but that he did not get that treatment for nearly four months, stated a plausible claim for relief.[2]  See McElligott, 182 F.3d at 1255; Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989) (holding that deliberate indifference was shown where physician's assistant knew a prisoner was in pain after a fall, but refused to allow him to see a doctor or otherwise treat him for about one month).

**Denial of Pain Treatment**

*Anissa Thomas*

Brennan's claim that he was not adequately treated for pain related to the periods of time during which he was not given prescription-strength medication three times daily.  As explained above, he alleged a plausible claim against Thomas for her failure to offer sufficient pain treatment between November 4 and December 20, despite Brennan's repeated complaints of severe pain.  See McElligott, 182 F.3d at 1257 ("[P]rison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain.").

---

[2] However, Brennan did not state a claim against Corizon Medical Services (Corizon), the contracted medical provider for the Alabama Department of Corrections, because he did not allege that this delay was the result of a Corizon policy or custom.  See Buckner v. Toro, 116 F.3d 450, 452–53 (11th Cir. 1997) (concluding that a private entity providing medical care to inmates may be directly liable under § 1983 if the action alleged to be unconstitutional is undertaken pursuant to that entity's policy or custom).

*Dr. Talley and Colleen Oakes*

Brennan also alleged sufficient facts to state a plausible claim against Oakes and Dr. Talley relating to the periods when he received Vicodin twice daily (which still left him in pain for eight to ten hours daily) and the period after Dr. Talley cut off his medication completely.  On December 20 Dr. Talley first prescribed Vicodin twice daily.  Brennan next saw Dr. Talley on December 29, and complained that he was in severe pain for eight to ten hours daily, depending on when he received his evening dose of Vicodin.  He asked to receive medication three times a day, but Dr. Talley told him that he could prescribe Vicodin at that rate only to patients who had broken bones or cancer or were recovering from surgery.

During Brennan's January 18 visit, Dr. Talley prescribed Vicodin in the morning and evening, and Ultram at noon.  On this new pain medication regimen, Brennan was pain free all day for the first time since his injury.  On February 18, Brennan attempted to renew his prescription, but Dr. Talley told him that he could get pain medications[3] only twice a day and only for seven to ten days.  Brennan requested a 30-day prescription, and Dr. Talley agreed.  Because he was getting medication only twice daily, he was once again in pain for eight to ten hours a day.

---

[3] It appears that Brennan's reference to pain medication focuses on opioids such as Vicodin and Ultram, because elsewhere he states that he was taking Naproxen, Mobic, and Tylenol.

8

On February 21 Brennan submitted a grievance to Oakes, who scheduled a meeting for the two of them with Dr. Talley the next day. Ultimately, they agreed that Brennan would get Vicodin three times a day, but that Dr. Talley would personally oversee his pain management. It took "quite some time" after the meeting for the schedule to be implemented, and Brennan says it was difficult to get his prescription renewed.

On May 16 Dr. Talley cut the dose of Brennan's pain medication in half. The next day a nurse informed Brennan that he was being weaned off of narcotics. After he received his last dose of pain medication on May 26, Brennan was in severe pain every day. He requested an appointment with Dr. Talley, but the doctor would not see him at that time.

On June 8 Brennan requested pain medication, but Dr. Talley said he could not provide it. Nevertheless, Dr. Talley prescribed Ultram once in the evening for two days so Brennan could sleep. Without pain medication, the pain became so severe that, on June 21, he began to use a wheelchair to get to the bathroom or to eat. At this point, Brennan believed that Dr. Talley had been instructed to discontinue inmates' pain medication unless they had cancer or broken bones. He saw Dr. Talley again on July 25 and requested pain medication, but Dr. Talley once again proscribed Ultram for only two nights. On August 7 Brennan asked for pain medication and muscle relaxers, but Dr. Talley prescribed only one dose of

9

Ultram.  Brennan submitted a grievance to Gwendolyn Terrance, a deputy warden at St. Clair, but never received a response.

Brennan had spinal fusion surgery on September 26.  The neurologist saw him on October 6 and told him he was healing well.  According to the neurologist, Brennan was to remain on pain medications for four to six weeks, then start on a muscle relaxer, and would continue to take medication for the rest of his life.  On October 12 Dr. Talley once again prescribed Vicodin three times a day and ordered a muscle relaxer.

The fact that Dr. Talley prescribed medication three times a day for a period of time, and Oakes agreed, indicates that they were aware of Brennan's pain and knew the proper course of treatment, but later withheld that treatment.  See Brown, 387 F.3d at 1351.  In reviewing the district court's statement that Brenan did "not have a constitutional right to be pain free," we are mindful that prison officials can violate the Eighth Amendment when they are able treat a prisoner's severe pain but decline to do so despite the prisoner's deteriorating condition.  McElligott, 182 F.3d at 1257–58.  For a number of weeks, Brennan's pain was managed for only part of the day.  And between May 26 and August 7, Brennan was in such constant pain that he was eventually confined to a wheelchair.  Despite his deteriorating condition during that time period he was only given occasional medication to help him sleep.  Brennan complained repeatedly both to Dr. Talley and to Oakes about

10

the effects of not having enough pain treatment, which were obvious.  See Goebert,

510 F.3d at 1327.  Brennan has stated a plausible claim for relief.

*Corizon*

Brennan also sufficiently alleged that his inadequate pain treatment was the

result of Corizon's policy allowing doctors to prescribe pain medication three

times a day to only prisoners who had broken bones or cancer, or who were

recovering from surgery.  Contrary to the magistrate judge's findings, the

complaint alleged that Dr. Talley said he was limited in his ability to prescribe

strong pain medication and that Oakes authorized him to do so only for a time.

Brennan stated that it was Corizon's responsibility to keep him out of pain until he

could see a neurologist, and alleged that refusing to prescribe him medication three

times a day was a cost-cutting policy that left him suffering for eight hours a day.

Brennan sufficiently alleged Corizon's direct liability.  See Buckner, 116 F.3d at

452 (explaining that claims made directly against a private entity's custom or

policy are actionable under § 1983).

**Access to Physical Therapy**

Brennan alleged that Corizon's policy prevented him from receiving the

recommended number of physical therapy appointments.  After surgery, Brennan's

neurologist stated that he should have physical therapy three times a week for six

to eight weeks, but Corizon's policy allowed him to see a physical therapist only

11

once.  Brennan had his single physical therapy appointment on November 9, and the therapist told him that even with the recommended therapy, he would suffer a permanent 20% to 25% loss of movement in his neck.

Brennan failed to allege, however, that having one physical therapy session placed him at risk of serious harm.  See Brown, 387 F.3d at 1351.  Brennan's complaint noted that that he would still suffer a loss of mobility in his neck even with the recommended number of physical therapy sessions.  He offered no additional facts to support a claim that he was harmed by not receiving more physical therapy.  For this reason Brennan failed to state a plausible claim regarding his access to physical therapy.

## **Failure to Intervene**

### *Deputy Wardens Headley and Terrance*

Brennan asked to see Headley in late November and again on December 4. After Dr. Talley reduced Brennan's medication on May 16, Brennan filed a grievance.  In a May 18 meeting with Headley about his pain medications, Brennan claimed that he had been following Dr. Talley's instructions.  Headley stated that he would look into the matter, but never communicated again with Brennan regarding his health care.  Brennan alleged he submitted a grievance to Terrance on August 7, but never received a response.

12

Though Brennan's complaint highlights a number of requests and a conversation with Headley and one grievance he filed with Terrance, he never alleged any facts to suggest that either of these defendants had subjective knowledge of the extent of his medical problems.  Neither did he allege any facts suggesting that either were involved in decisions related to his diagnosis and treatment, or that they were able to intervene in his medical treatment but refused to do so.  Brennan failed to state a claim against Headley and Terrance.

In sum, Brennan failed to state a claim against Corizon for any delay in his treatment or the denial of physical therapy, and against Headley and Terrance for failing to intervene, and we affirm the district court's dismissal of those claims. Brennan did state a claim, however, against Thomas, Oakes, and Dr. Talley for delaying diagnosis and treatment of his neck and back injuries.  He also stated a claim against those three defendants along with Corizon for failing to treat his pain.  We vacate the district court's order dismissing these claims and remand for further proceedings.

## III.

We next address Brennan's challenge to the district court's failure to allow him to amend his complaint, a decision we review for an abuse of discretion. Brown, 387 F.3d at 1347.  A party may amend his pleading once as a matter of course within 21 days after serving it, or 21 days after service of a responsive

13

pleading, even if the plaintiff is subject to the Prison Litigation Reform Act.  Fed. R. Civ. P. 15(a)(1); Brown, 387 F.3d at 1349–50.  A pro se litigant must be given at least one opportunity to amend his complaint before the court dismisses the action with prejudice[4] if it appears that a more carefully drafted pleading would state a claim upon which relief could be granted.  Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001) (per curiam).

Brennan may cure the defects in his complaint if he makes additional allegations about Corizon's policies, and Headley's and Terrance's involvement in his treatment.  See Burger King Corp. v. Weaver, 169 F.3d 1310, 1320 (11th Cir. 1999).  Such amendments would not have been futile, and should have been allowed as a matter of course.  See Tazoe v. Airbus S.A.S., 631 F.3d 1321, 1336 (11th Cir. 2011).  Therefore, the district court erred in dismissing the complaint without giving Brennan at least one opportunity to amend.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**

---

[4] The district court did not specify whether it dismissed the action with or without prejudice.  But because the statute of limitations on Brennan's § 1983 claims is two years, see Baker v. Birmingham Bd. of Educ., 531 F.3d 1336, 1337 (11th Cir. 2008), the dismissal here was with prejudice as a practical matter because the alleged violations took place more than two years before the complaint was dismissed.  See Boazman v. Econ. Lab., Inc., 537 F.2d 210, 213 (5th Cir. 1976) ("[W]here the dismissal is without prejudice, but the applicable statute of limitations probably bars further litigation, the standard of review of the [d]istrict [c]ourt's dismissal should be the same as is used when reviewing a dismissal with prejudice."); see also Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting Fifth Circuit decisions entered before October 1, 1981 as binding precedent).